LOUIE R. HESS et al., Appellants, v. IOWA BANKERS MORTGAGE COMPANY et al., Appellees.

**BILLS AND NOTES:** Holdership in Due Course. The "bad faith"
1   which will destroy the claim of holdership in due course of the indorsee of a negotiable promissory note means actual knowledge of such facts and circumstances as would charge a reasonably prudent business man with dishonest motives in purchasing the paper. Evidence held to sustain a finding of good faith.

**APPEAL AND ERROR:** Abstracts—Exhibits Not Part of Record. Ex-
2   hibits certified to by the clerk of the trial court, but not referred to in the abstract, are no part of the record on appeal.

*Appeal from Linn District Court.*—ATHERTON B. CLARK, Judge.

DECEMBER 11, 1924.

PLAINTIFFS appeal from separate judgments against them on a counterclaim in favor of the Ulch Brothers State Bank upon certain promissory notes. The issues were tried in equity,

and the case is triable *de novo* on this appeal. The nature of the proceedings and the material facts will be fully stated in the opinion.—*Affirmed.*

*North & Pollock* and *Hugh J. Wade,* for appellants.

*Frank C. Byers* and *Johnson, Donnelly & Lynch,* for Ulch Brothers State Bank, appellees.

STEVENS, J.—The Iowa Bankers Mortgage Company, a corporation having its principal place of business at Cedar Rapids, Linn County, was organized sometime prior to November, 1919. During that month, appellants separately sub-

1. BILLS AND NOTES: holdership in due course.

scribed for stock in the above corporation, in the aggregate amount of $63,000. $4,125 was paid in cash, and Louie R. Hess gave his notes to the corporation for $56,150, and Vernon, his son, for $2,625. In March, 1920, appellants commenced an action in equity in the district court of Linn County, to rescind and cancel the subscription contracts and the notes executed to the corporation, upon the ground that their execution was induced by fraud. Later, an amendment to the petition, asking the appointment of a receiver for the corporation, was filed, and on April 10, 1920, a receiver was appointed by the court. A few days later, the corporation appeared and filed answer to appellants' petition. A further hearing was had upon the issues joined; and, on April 15, 1920, the appointment of a receiver was confirmed, and E. M. Scott qualified as such receiver. The Ulch Brothers State Bank of Solon, Iowa, was joined as defendant in the original petition.

Hearings previous to the one in question were had before different judges upon various issues joined between other parties than Ulch Brothers State Bank; and on February 16, 1923, the issues from which this appeal was taken, were tried in equity before Judge Clark, one of the district judges of Linn County. On or about December 10, 1919, Ulch Brothers State Bank, hereinafter referred to as the appellee, acquired from the Iowa Bankers Mortgage Company one of the notes executed to it by the appellant Louie R. Hess for $6,738.16, and on November 14th, acquired all of the notes executed by the appellant Vernon

L. Hess thereto, for stock aggregating $2,691.74.   On June. 7, 1920, appellee filed answer to appellants' petition, setting up, by way of counterclaim, its causes of action upon the notes referred to, and demanded judgment thereon.   Appellants, for answer to the counterclaims, alleged fraud in the inception of the notes, and that appellee, at the time they were acquired, knew thereof, and had knowledge of such facts and circumstances concerning the organization and methods of business of the payee as made the purchase of the notes an act of bad faith.

The inclusion in the record by appellants of much testimony introduced upon the previous hearings which was not offered upon the trial of the issues involved upon this appeal, has added materially to the difficulties of the court in ascertaining the facts proper to be reviewed upon this appeal.   Transcripts of the evidence in the previous hearings before different judges of the district court were filed in this court; but, of course, these transcripts cannot be considered.   Numerous exhibits which appear to have been identified and offered in evidence are not incorporated in the abstract.   The certification of exhibits by the clerk of the district court does not make them a part of the record; and unless they are set out in the abstract, they cannot be considered by this court.

2. APPEAL AND ERROR: abstracts: exhibits not part of record.

The allegations of the original petition and of the answers to the counterclaims of appellee that the agent of the bonding company who obtained the subscriptions of appellants for stock falsely represented to them that the par value thereof was $150 per share; that the corporation was in partnership with the United States government; that it was a Federal land stock bank; that it was making profits at the rate of 30 per cent per annum, for which dividends had been paid; and that the corporation had a large surplus in its treasury, are fairly sustained by the evidence.   Appellant Louie R. Hess further testified that the agent represented and stated to him that the corporation desired to place a farmer upon its board of directors, and that, if he would subscribe for stock, he would later be elected to that position, and that the corporation would loan him large sums of money at low rates of interest.   Appellant was not elected

a director, and it is not disclosed by the record that any money was loaned him.

Under the Negotiable Instruments Law:

"A holder in due course is a holder who has taken the instrument under the following conditions:

"1.   That the instrument is complete and regular upon its face.

"2.   That he became the holder of it before it was overdue, and without notice that it had been previously dishonored, if such was the fact.

"3.   That he took it in good faith and for value.

"4.   That at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it." Section 9512, Code of 1924.

"The title of a person who negotiates an instrument is defective within the meaning of this chapter when he obtained the instrument, or any signature thereto, by fraud, duress, or force and fear, or other unlawful means, or for an illegal consideration, or when he negotiates it in breach of faith, or under such circumstances as amount to a fraud." Section 9515, Code of 1924.

"To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith." Section 9516, Code of 1924.

Fraud in the inception of the notes sued upon having been established, the title of the original holder was defective, and the burden was, therefore, upon appellee, to prove that the notes were acquired in due course. Section 9519, Code of 1924; *Arnd v. Aylesworth,* 145 Iowa 185; *Connelly v. Greenfield Sav. Bank,* 192 Iowa 876; *German American Nat. Bank v. Kelley,* 183 Iowa 269; *Central St. Bank v. Peoples Sav. Bank,* 196 Iowa 43.

The record discloses no facts or circumstances from which actual knowledge on the part of the officers of appellee bank of the fraud charged may be inferred. This being true, the issues reduce themselves to one proposition: that is, does the record show knowledge on the part of the officers of appellee of such

facts or circumstances as made the purchase of the notes an act of bad faith? Actual knowledge of just what facts and circumstances will render the purchase of a negotiable instrument an act of bad faith, is not susceptible of precise designation. The term "bad faith," as used in the statute, is the direct opposite of good faith, and means actual knowledge of such facts and circumstances as would charge a reasonably prudent business man with bad faith and dishonest motives in purchasing the paper. *Vaughn v. Johnson*, 20 Idaho 669 (119 Pac. 879); *Shultz v. Crewdson*, 95 Wash. 266 (163 Pac. 734); *Marion Nat. Bank v. Harden*, 83 W. Va. 119 (97 S. E. 600); *Everding & Farrell v. Toft*, 82 Ore. 1 (160 Pac. 1160); *Burnham Loan & Inv. Co. v. Sethman*, 64 Colo. 189 (171 Pac. 884); *Gigoux v. Moore*, 105 Kan. 361 (184 Pac. 637); *Link v. Jackson*, 158 Mo. App. 63 (139 S. W. 588); *Morris v. Muir*, 111 Misc. Rep. 739 (181 N. Y. Supp. 913).

The cases are uniform in their holding that mere negligence, knowledge of suspicious facts and circumstances, or failure to inquire into the consideration, is insufficient to charge a holder of negotiable paper with bad faith in its procurement. *Arnd v. Aylesworth*, supra; *McNight v. Parsons*, 136 Iowa 390. If, however, the holder had actual knowledge of suspicious circumstances, coupled with the means of readily informing himself of the facts, and he willfully abstains from making inquiries, his intentional ignorance may amount to bad faith. *Everding & Farrell v. Toft*, supra, and other cases cited supra.

We come now to analyze the facts in the light of the rules stated. At the time the instruments were executed, appellants resided in Grundy County, and the appellee bank had its principal place of business at Solon, in Johnson County. At this time, appellants and Ulch Brothers were wholly unknown to each other; and, so far as is disclosed by the record, the agent of the payee who negotiated the sale of stock to appellants was likewise unknown to the officers of appellee bank. The note of the appellant Louie R. Hess was purchased by appellee in December, and the notes of Vernon L. Hess in February, 1920. Full consideration was paid for the notes in the form of certificates of deposit on the appellee bank to the payee thereof. Notes aggregating substantially $40,000 were purchased on

behalf of appellee from the Mortgage Company, and certificates of deposit issued to it therefor. Before purchasing the notes in controversy, J. S. Ulch wrote a letter to each of appellants, informing them that a representative of the Cedar Rapids corporation had offered their respective notes to the bank for sale, and inquiring if the transaction was satisfactory, and if the notes would be paid promptly at maturity. The senior Hess answered promptly, requesting a delay of a few days, as he contemplated going to Cedar Rapids to see the company. A few days later, replying further to the inquiry, he stated that it was all right for the bank to acquire the notes, and requested that he be advised of the date of their maturity. Vernon L. Hess did not reply until February, 1920, when he wrote Ulch that it would be satisfactory to him for the bank to purchase his notes. The records of the corporation show that Ulch Brothers subscribed for stock therein in a considerable amount, and that one Elgert, an agent of the corporation, assisted in the sale of some of his stock, at a substantial profit to J. S. Ulch. This occurred prior to the acquisition by the bank of the notes in suit. J. S. Ulch testified that he, too, was promised a directorship in the corporation; and the evidence shows that a circular gotten up and circulated by the corporation listed him as one of its directors. He was not, however, in fact a director, and there is nothing in the record tending to show that he had any actual knowledge that the corporation was organized for a fraudulent purpose, or that it was conducting a dishonest business. It is not shown that he ever attended a meeting of the board of directors. He did not at once repudiate the authority of the corporation to hold him out as a director, but did finally protest against the use of his name in that connection. It may have been the purpose of the officers of the Cedar Rapids corporation to elect J. S. Ulch as a member of the board of directors. He testified that he tentatively consented to serve in that capacity. Interim certificates were forwarded from the Cedar Rapids office of the Mortgage Company to appellee, to be delivered to subscribers for stock residing in the vicinity of Solon, upon the payment of the amount required for that purpose, where considerable stock, with the knowledge of the officers of the bank, was subscribed for. It appears that J. S. Ulch knew that the stock from the

sale of which he derived a profit was sold at a price considerably in excess of its par value.

It may be conceded that the evidence introduced upon the trial, as disclosed by the above statement of the record, if the case had been tried by ordinary proceedings, would have been sufficient to entitle appellants to have the issue of good faith on the part of appellee submitted to a jury. *Central St. Bank v. Peoples Sav. Bank,* supra; *German American Nat. Bank v. Kelley,* supra; *Connelly v. Greenfield Sav. Bank,* supra; *Arnd v. Aylesworth,* supra.

Furthermore, there is no difference in the quantum of proof required to show good faith on the part of the holder of negotiable paper, the title to which is defective, in actions at law, triable to a jury, and in actions in equity, triable to the court. In the one case, the jury is the agency for determining its sufficiency; and in the other, the agency is the court. There may, however, be a wide difference between what is sufficient evidence to require submission of the issues to a jury and the quantum of proof demanded by the court, as a trier of the facts, to sustain a charge of bad faith. Does the evidence in this case charge appellee with actual knowledge of such facts and circumstances as made the purchase of the notes in question an act of bad faith? In other words, has appellee met the burden cast upon it by the statute, and proved the *bona fides* of the transaction? It must be remembered that no officer of the bank had actual knowledge of the fraud charged against the payee of the notes. We find nothing in the record in any way tending to show that the inquiry made of appellants by J. S. Ulch concerning the notes was not in good faith, or that it was for the purpose of laying a foundation in advance, on which to predicate a claim of *bona fides.* The most that can be claimed for the evidence is that it shows that appellee had sufficient knowledge of the business of the payee to have aroused its suspicions as to the fraudulent character of payee's organization, together with its methods of transacting business. The notes were voluntarily executed and put in circulation by appellants, who must be held to have had some knowledge of the manner in which negotiable paper is bought and sold. Appellee in no sense participated in the fraud practiced by the agent of the payee, nor were its officers

bound to make inquiry, at the peril of the bank, as to the transaction, for the purpose of informing themselves as to the good faith of the transactions. The penalty imposed by the statute upon purchasers of negotiable paper is that, if they acquire it with actual knowledge of fraud on the part of the payee, or of such facts and circumstances as taint the transaction with bad faith, the paper is subject to defenses.

If the transaction by which appellee acquired the notes, when viewed in the light of all of the evidence, is open to the charge of bad faith, then the business of buying and selling negotiable paper is indeed a precarious one. It is probably true that appellants had not yet discovered the fraud practiced upon them, at the time the letters were written to J. S. Ulch; nevertheless, in the absence of knowledge of such facts and circumstances as made it his duty to investigate, the assurances conveyed thereby must be given some weight, in any effort to arrive at the truth of the matter. The preponderance of the evidence, in our opinion, supports the *bona fides* of the transaction.

Other questions discussed by counsel are without merit, and need not be considered. The separate judgments entered against appellants in the court below must be affirmed. It is so ordered. —*Affirmed*.

ARTHUR, C. J., and EVANS and VERMILION, JJ., concur.